**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **40 West Hubbard, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 20 C 4909 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| **RCSH Operations, Inc. (d/b/a Ruth's Chris** ) | |
| **Steakhouse) and Ruth's Hospitality Group, Inc.** ) | |
| **(f/k/a Ruth's Chris Steakhouse, Inc.),** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Plaintiff's motion for partial summary judgment [60] and cross-motion for summary judgment on tenantability issues [78] are granted. Defendant's motion for summary judgment [68] is denied. The parties are directed to confer and file a status report within 10 days of the date of entry of this order setting forth the issues remaining for trial and listing three proposed trial dates in January and February 2024. The parties' report shall also include an estimated length of trial. The parties are encouraged to discuss settlement. The parties' motions to seal [64, 66, 74] are denied without prejudice to renewal; the Court will allow the sealed versions of the relevant documents to remain on the electronic docket for 21 days. In the event no renewed motions to seal are filed within 21 days of the date of entry of this order, the Court directs the parties to file at that time unredacted public versions of the currently sealed documents.

## STATEMENT

**Background**

This action involves a lease (the "Lease") between 40 West Hubbard, LLC ("Hubbard") as lessor and RCSH Operations, Inc. ("Ruth's Chris") as lessee for the subject premises ("Premises"), where Ruth's Chris operated a restaurant in Chicago.[1] After the COVID-19 pandemic started and Illinois government authorities imposed certain restrictions on businesses, Ruth's Chris closed its

---

[1] The Lease is between the parties' predecessors in interest, the names of which are immaterial to the instant motions and order. (Compl., Dkt. # 2, at ¶ 7.) Various modifications, amendments to, and extensions and assignments of the Lease subsequently were executed, the details of which are also immaterial to the motions under consideration. (*Id*. ¶¶ 8-14.) Ruth's Chris Hospitality Group ("Hospitality") executed a guaranty of the Lease, the alleged breach of which is the subject of Count II of Hubbard's complaint.

restaurant, stopped paying rent, and terminated the Lease. On August 20, 2020, Hubbard filed the instant lawsuit for breach of the Lease against Ruth's Chris and breach of the guaranty against Hospitality. On October 5, 2020, Ruth's Chris filed its answer, which raised fourteen affirmative defenses and asserted a four-count counterclaim. Ruth's Chris moves for summary judgment on Hubbard's breach-of-lease claims on the ground that it properly exercised its right under the Lease to terminate it because the Premises became partially untenantable due to COVID-19. Hubbard separately moves for partial summary judgment as to certain of Ruth's Chris's affirmative defenses. Some of the defenses and counterclaims are premised on the argument that the Premises became "untenantable" within the meaning of Section 13 of the Lease, thereby excusing Ruth's Chris of its obligation to pay rent. Thus, Hubbard's motion for partial summary judgment on certain of the affirmative defenses has some overlap with Ruth's Chris's motion for summary judgment regarding the untenantability of the Premises. The Court addresses the motions in turn.

**Facts**

The Lease. In 1992, Ruth's Chris leased the Premises, where it continuously operated a Ruth's Chris steakhouse. Pursuant to an amendment, the term of the Lease ends on August 31, 2022. Section 13 of the original Lease provides for the rights and duties of the parties in the event the Premises is rendered untenantable. The Court sets forth the relevant provisions of the Lease in the Analysis section of this order.

Government's COVID-19 Orders. A March 9, 2020 order issued by J.B. Pritzker, the Governor of Illinois, declared all counties in Illinois to be in a state of disaster. A March 15, 2020 order issued by the Commissioner of the Department of Public Health for the City of Chicago limited any establishment that sold liquor, which included Ruth's Chris, to operating in Chicago at 50% of its indoor capacity. A March 16, 2020 order issued by Governor Pritzker mandated that Illinois restaurants "suspend service . . . and . . . not permit on-premises consumption" of "food or beverages" until March 30, 2020. The March 16 order further stated that restaurants "are permitted and encouraged to serve food and beverage so that they may be consumed off-premises" and allowed customers to enter restaurants to purchase carry-out orders. Government orders extended the March 16 suspension-of-service order for indoor on-premises dining through the end of May 2020. Ruth's Chris asserts that a May 2020 government order permitted on-premises dining in parts of Illinois, but the exhibit it cites, a May 29, 2020 Executive Order by the Governor Pritzker, (DX 10, Dkt. # 70-37, at 6/11), indicated that businesses offering food and drink for on-premises consumption "must suspend service for and may not permit on-premises consumption." A June 26, 2020 Executive Order by Governor Pritzker allowed restaurants to "resume service for on-premises consumption." (DX 11, Dkt. # 70-38, at 6/9.) The City of Chicago resumed indoor dining the same day, but restricted indoor on-premises dining to 25% of indoor capacity with a maximum capacity of 50 people per room or floor.[2] An October 29, 2020, government order again stopped indoor dining and only permitted outdoor dining.

---

[2] While Ruth's Chris contends that indoor dining did not resume in the City of Chicago until July 24, 2020, a June 19, 2020 press release from the Office of the Mayor indicates that restricted indoor dining was resuming on June 26, 2020. *See* https://www.chicago.gov/content/dam/city/depts/

2

Ruth's Chris's Response to Government Orders. On March 16, 2020, David Stiles, General Manager of Ruth's Chris's Chicago restaurant, sent Lauren Landri of Friedman Properties ("Friedman"),[3] an email stating: "As mandated by the Governor, we will not be open for regular dining for the next 2 weeks. We will, however, be offering To Go/GrubHub/Caviar for the time being." Ruth's Chris operated a take-out and delivery service from the restaurant from March 17-21, 2020, averaging in daily sales an amount in the low four figures. Ruth's Chris did not reopen the restaurant to the public for any purpose after closing on March 22, 2020. Although Ruth's Chris paid its March 2020 rent, Ruth's Chris advised Hubbard that same month that it would not be able to pay future rent due to the impact of the government orders requiring restaurants to be closed to on-premises consumption. On May 28, 2020, Ruth's Chris's general counsel advised consultants and staff that the Chicago restaurant "was [the] #1 priority to close," that Ruth's Chris was "willing to spend a very large amount of money to close it," and that "[u]nder no circumstances should that restaurant reopen." On July 28, 2020, Hubbard sent Ruth's Chris a notice of default for nonpayment of rent. Ruth's Chris continued to operate its Barrington and Northbrook, Illinois restaurants.

After the onset of the pandemic, Ruth's Chris conducted an analysis of the costs and profitability of its restaurants. Ruth's Chris concluded that the pandemic would have the largest impact on its restaurants in urban markets due to the exodus of people from cities and business centers, which caused a significant loss of foot traffic. According to Ruth's Chris, its Chicago restaurant was in a precarious situation prior to the onset of the COVID-19 pandemic because return on investment had trended downward for years, and Ruth's Chris concluded that the COVID-19 government orders would exacerbate that trend. After assessing the financial viability of the Chicago restaurant in light of the COVID-19 pandemic and government orders, Ruth's Chris concluded in May 2020 that it would consider reopening the Chicago restaurant if it were able to seat at least 50% capacity. The Chicago restaurant had higher expenses than Ruth's Chris's other restaurants, in part because it offered lunch and therefore had longer operating hours. Ruth's Chris continued to reassess reopening, including by physically entering the restaurant to stage how its dining-room floor would operate within the table spacing required to operate at 25% or 50% capacity.

Parties' Negotiations Related to the Lease. In a March 26, 2020 letter to Friedman, Ruth's Chris stated that it had "ceased regular operations in all locations, including the premises we lease from you," and as a result, could not "remit payment(s) of rent, operating expenses or other additional rent while we are temporarily closed." The letter further stated that "we will resume paying rent, operating expenses and all other additional rent effective thirty (30) days after the . . . [r]estrictions are lifted." Ruth's Chris hired A&G Realty Partners, LLC ("A&G") in April 2020 to seek concessions from Ruth's Chris's landlords, including Hubbard. Frank O'Neill, a

---

/mayor/Press%20Room/Press%20Releases/2020/June/IndoorDiningTimeline.pdf (last visited Aug. 24, 2022). According to the press release, "Mayor Lori E. Lightfoot . . . today announced that indoor dining and drinking can begin at restaurants, bars, breweries and other eating and drinking establishments on Friday, June 26 *to align with the State's plan to move to phase four on the same day*." *Id*. (emphasis added).

[3] According to Hubbard, Friedman is Hubbard's managing entity.

3

representative from A&G, sent Friedman an email on May 5, 2020 stating that he had left a voicemail about "discuss[ing] the Ruth's Chris store in Chicago" and would "like to discuss an early termination of [Ruth's Chris] lease." Hubbard knew that Ruth's Chris had been planning capital expenditures at the Premises, as evidenced by a May 7, 2020 email in which a Friedman employee stated that Ruth's Chris's vendor "was in touch as recently as the first week or two of our teleworking" about "new awnings, [e]xterior lighting, canopy, and storefront painting." On May 14, 2020, O'Neill sent an email to Robert Zimmerman, Director of Leasing at Friedman, noting the "challenges that Ruth's Chris anticipates experiencing over the coming years" and stating that "[a]t this time, there are no plans to reopen the Chicago restaurant." On May 21, 2020, O'Neill advised Ruth's Chris that "withholding rent and not re-opening need to be used to encourage Landlord to negotiate." On July 22, 2020, Lisa O'Keefe, Legal Officer for Friedman, wrote to James Weiss, Director of Asset Management for Friedman, directing him to "get a name from the guy [representing Ruth's Chris] who we talk [to] about the lease and their reopening[.]" In response to that inquiry, Ruth's Chris informed Hubbard in July 2020 that Ruth's Chris intended to reopen the Chicago restaurant when it could operate at 50% on-premises capacity. Hubbard subsequently solicited a buyout offer of Ruth's Chris's Lease. A&G complied with Hubbard's request and made a buyout offer on Ruth's Chris's behalf. Hubbard did not engage with A&G on the buyout offer and filed the instant lawsuit. Ruth's Chris notified Hubbard on or about October 22, 2020 that it was terminating the Lease.

**Motions to Seal**

Both parties move for leave to file certain documents under seal. Ruth's Chris seeks to file the following documents under seal, which it designated during discovery as confidential: DXs 16–18; DX 19, Illinois Analysis (also an exhibit to Mark Nourjian's Deposition ("the M. Nourjian Deposition"); M. Nourjian Deposition Exhibits 7–8, 14, 16–17, and 21; and Frank O'Neill Deposition ("the F. O'Neill Deposition") Exhibit 7. According to Ruth's Chris, "these documents contain financial information related to Ruth's Chris's business operations which is confidential, commercially sensitive, and not publicly available," and "[c]onsequently, these documents should not be disclosed publicly." Pursuant to Hubbard's designations of confidentiality, Ruth's Chris also seeks to file electronically under seal the following documents it has attached as exhibits to its Statement of Material Facts: DXs 22, 24-26, and 29-31, and Albert Friedman Deposition Exhibits 110-16. Ruth's Chris also seeks leave to file electronically its Memorandum, Statement of Material Facts, and F. O'Neill's Deposition with partial redactions, including: Memorandum at 7-8 (quoting DXs 25-26 and 29-31) and 14 (quoting DX 24); Statement of Material Facts ¶¶ 33 (quoting DX 22), 35 (quoting DX 24), 36 (quoting DX 25), 37 (quoting DX 26), 39 (quoting DX 29), 40 (quoting DX 30), and 41 (quoting DX 31); and F. O'Neill's Deposition 32:4-32:21.

Based on a confidentiality designation by Ruth's Chris, Hubbard moves for leave to file under seal the following: M. Nourjian Deposition Exhibits 9, 10, 11, 13, 14, 15, 16, 17, 18, 21, and 23, and F. Neill Deposition Exhibits 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 18.[4]

---

[4] The Court notes that Magistrate Judge Gilbert already granted Plaintiff's motion for leave to file under seal Exhibit 3 to Frank O'Neill's deposition (Dkt. # 38).

4

In *Baxter International, Inc. v. Abbott Laboratories*, 297 F.3d 544 (7th Cir. 2002), the Seventh Circuit acknowledged that parties often enter into "broad secrecy agreement[s] . . . in order to expedite [the discovery] process by avoiding document-by-document analysis," and opined that "[s]ecrecy is fine at the discovery stage, before the material enters the judicial record." *Id*. at 545. The *Baxter* court emphasized, however, that "those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Id*. (citations omitted). Documents that "affect the disposition of federal litigation are presumptively open to public view." *Goesel v. Boley Int'l (H.K.) Ltd.*, 738 F.3d 831, 833 (7th Cir. 2013). Neither party sets forth any authority for allowing the requested redactions. Accordingly, the motions to seal are denied without prejudice to renewal; the Court will allow the sealed versions to remain on the electronic docket for 21 days. In the event no renewed motions to seal are filed within 21 days of the date of entry of this order, the Court directs the parties to file unredacted public versions of the currently sealed documents.

**Summary Judgment Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

**Analysis**

  A. <u>Breach of the Lease and Untenantability</u>

To state a claim for breach of the Lease, Hubbard must establish the following elements: "(1) the existence of a valid and enforceable contract; (2) performance by [Hubbard]; (3) breach of the contract by [Ruth's Chris]; and (4) resultant injury to [Hubbard]." *Czarnik v. Lee*, No. 1-18-1047, 2019 WL 3801656, at *3 (Ill. App. Ct. Aug. 12, 2019).[5] Hubbard contends that Ruth's Chris breached the terms of the Lease when it stopped paying rent. Ruth's Chris contends that no breach occurred because the Premises were rendered partially untenantable by COVID-19 and the subsequent government orders restricting service. Ruth's Chris asserts that pursuant to the partial untenantability provision, it properly exercised its business judgment to cease paying rent. The parties, and therefore the Court, refer to this dispute as the "untenantability" issue.

---

[5] The parties agree that Illinois law applies to Hubbard's claims and Ruth's Chris's affirmative defenses.

The relevant portion of Section 13 of the Lease, entitled "Fire or Casualty," states as follows:

> A. "UNTENANTABILITY". For the purposes hereof, and so long as the Premises are used for restaurant uses and purposes, "total untenantability" or "totally untenantable" shall mean: 1. the . . . Premises are ordered closed by relevant governmental authorities through no fault of Lessee, or 2. all or substantially all of the kitchen facilities are destroyed; or 3. 1/3 or more of all dining/banquet/bar/washroom facilities are destroyed; or 4. The Premises become Inaccessible; or 5. the Premises suffers such smoke damage from any fire that Lessor and Lessee reasonably and mutually agree the Premises should be closed; In any such case not as a result of the Intentional affirmative act of Lessor or Lessee. Any lesser or other damage or destruction resulting from any such cause which allows the Premises or any substantial portion thereof to remain open for business in the business judgment of Lessee reasonably exercised, shall be deemed "partial untenantability" or "partially untenantable".
> . . .
> Notwithstanding the foregoing [i.e., the events that constitute untenantability], in order for the provisions of Section 13 to become operable the damage or destruction must not be capable of correction or substitution within 48 hours."
> . . .
>
> C. Rent shall abate during untenantability. If there has been total untenantability, Rent shall abate in full . . . . In the case of partial untenantability, Rent shall abate equitably as Lessor and lessee reasonably may agree, with Lessor and Lessee left with the right to seek such loss of rents or business interruption coverage as each may have available in such case.

(Lease, Dkt. # 1-1, § 13.) In the case of partial untenantability, "if the Premises become partially untenantable when one (1) year or less of the Term remains, neither Lessor nor Lessee shall have any restoration or reopening obligations (as the case may be) and either may terminate this Lease by notice to the other not later than the expiration of 30 days after the event of untenantability." (*Id.*, § 13.D.) In addressing the parties' arguments as to the meaning of Section 13, the Court notes that in construing a contract, "the primary objective is to give effect to the intention of the parties." *Ross v. First Fin. Corp. Servs., Inc.*, No. 19 C 1849, 2022 WL 1567128, at *4 (N.D. Ill. May 18, 2022) (citation omitted, alteration removed).

As noted, Ruth's Chris asserts that because the Premises were rendered partially untenantable by the government orders temporarily closing in-person dining, it properly exercised its business judgment to close the restaurant and stop paying rent. Hubbard contends, however,

6

that "no relevant government authority issued any order that prohibited entry upon, or vacation of, the Premises. . . .," (Pl.'s Mem. Opp'n., Dkt. # 80, at 13), and as a result, the Premises was not rendered untenantable. Ruth's Chris asserts that "[i]t stands to simple reason—and is supported by the supplied definitions—that an order requiring the dining room closed is an order closing, or at least partially closing, the Premises." (Def.'s Reply, Dkt. # 84, at 11.) The Court disagrees. While the March 16, 2020 gubernatorial order temporarily prevented Ruth's Chris from opening its in-person dining room, it did not close the Premises. The order at issue directed restaurants to "suspend service . . . and . . . not permit on-premises consumption" of "food or beverages" until March 30, 2020. (DX 5, Dkt. # 71-5, at 2.) The March 16, 2020 order further stated that restaurants "are permitted and encouraged to serve food and beverage so that they may be consumed off-premises" and allowed customers to enter restaurants to purchase carry-out orders. (*Id*.) Ruth's Chris employees could enter the Premises to work, and Ruth's Chris was permitted to continue operating as a restaurant for delivery and takeout – which it did, for approximately one week, before closing at the end of March 2020.[6] Ruth's Chris's contention that the Premises were ordered closed is further weakened by the fact that the order dated April 30, 2020 deemed restaurants to be essential businesses that were expressly authorized to continue operations during the pandemic. (DX 8, Dkt. # 71-8, § 12.l.) Moreover, the government orders were temporary and periodically permitted on-premises consumption (both indoor and outdoor). The Court agrees that the Premises were not ordered closed by government authorities and, therefore, Ruth's Chris cannot rely on this provision for establishing total untenantability, and in turn, partial untenantability.

Ruth's Chris attempts to undermine this conclusion by pointing to the intended-use definition in the Lease, which provides that the Premises is to be used "ONLY and for NO other use" than as a "typical 'RUTH'S CHRIS STEAK HOUSE.'" (Lease, Dkt. # 1-1, § 1.01(I)). According to Ruth's Chris, the takeout and delivery options were not viable alternatives given that Ruth's Chris is a "luxury dining experience" with white tablecloths and 500-degree plates. Thus, Ruth's Chris asserts, the government orders disallowing on-premises consumption of food means that the restaurant could not operate as a typical Ruth's Chris restaurant and was, therefore, rendered untenantable under Section 13. However, Section 1.01(I) states in full that "Lessee shall use and occupy the Premises for the following uses and purposes ONLY and for NO other use or purpose *without the express prior written consent of Lessor*: typical 'RUTH'S CHRIS STEAKHOUSE' as shown by Lessee's business data presented to Lessor immediately prior to the execution of this Lease." (*Id*.) (emphasis added). Assuming arguendo that operating takeout and delivery service means that Ruth's Chris was not using the Premises as a typical Ruth's Chris steakhouse, Ruth's Chris does not point to any evidence that it sought or was denied Hubbard's consent to operate temporarily as something other than a "typical" Ruth's Chris Steakhouse. Its reliance on the intended-use provision to salvage its contention that the Premises was rendered untenantable is, therefore, unfounded.

---

[6] As noted above, it is undisputed that Ruth's Chris continued to operate two other Illinois restaurants that were subject to the same statewide order.

7

Because the Premises were not ordered closed by relevant government authorities, Ruth's Chris's contention that it properly exercised its business judgment to close when the Premises were rendered partially untenantable fails.

B.  Affirmative Defenses

While the terms of the Lease do not entitle Ruth's Chris to avoid liability for its failure to pay rent, it also has asserted affirmative defenses to Hubbard's claim that it breached the Lease. Hubbard has filed a motion for partial summary judgment as to certain of the affirmative defenses and counterclaims. In addressing Hubbard's motion for partial summary judgment on the affirmative defenses, the Court applies the same standard it applied to the parties' cross-motions for summary judgment on untenantability, discussed above.

Ruth's Chris argues that it was "excused from paying rent because of the impact of Covid-19 and related government orders, which frustrated the purpose of the Lease, rendered performance impossible[,] and robbed Hubbard's consideration of value." (Ruth's Chris's Opp'n Hubbard's Mot. Partial Summ. J., Dkt. # 81, at 1.)[7]

*Impossibility of Performance*

The doctrine of legal impossibility or impossible performance "excuses performance of a contract only when performance is rendered *objectively* impossible either because the subject matter is destroyed or by operation of law." *Innovative Modular Sols. v. Hazel Crest Sch. Dist. 152.5*, 965 N.E.2d 414, 421 (Ill. 2012) ("*IMS*") (emphasis in original). The impossibility doctrine "is narrowly applied based on the 'judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances.'" *Pepper Constr. Co. v. Palmolive Tower Condos., LLC*, --- N.E.2d ---, 2021 WL 4236109, at *15 (Ill. App. Ct. Sept. 17, 2021) (citation omitted). "The party advancing the doctrine has the burden of proving impossibility." *Id.* In addition, Ruth's Chris "must show that the events or circumstances which [it] claims rendered [its] performance impossible were not reasonably foreseeable at the time of contracting." *Ulanov v. Ulanov*, No. 1-18-2501, 2020 WL 7232983, at *6 (Ill. App. Ct. Dec. 7, 2020). "The foreseeability of the frustrating event is a question of law to be resolved by the court." *Scottsdale Ltd. P'ship v. Plitt Theatres, Inc.*, No. 97 C 8484, 1999 WL 281085, at *3 (N.D. Ill. Mar. 31, 1999).

In *IMS*, cited above, a finance authority ("Authority") was created to manage the defendant school district's finances pursuant to Illinois statute. After the Authority cancelled leases on modular trailers rented by the school district from IMS and the school district failed to pay the cancellation fees, IMS sued. The Illinois Supreme Court rejected the school district's defense of

---

[7] "The doctrines of commercial frustration and impossibility are not applicable where the risk or circumstance is covered by a term in the contract." *PNC Equip. Fin., LLC v. Flash Limousine, Inc.*, No. 20 C 6773, 2021 WL 3142124, at *2 (N.D. Ill. July 25, 2021). While the Lease here contains a *force majeure* provision, the parties do not discuss it, so the Court does not address it.

8

impossibility because "the subject matter of the lease contracts, the modular buildings, have not been destroyed, nor has the Act rendered performance of the contracts objectively impossible by operation of law." *IMS*, 965 N.E.2d at 421. Similarly, here, the Premises were not destroyed, nor was the operation of the restaurant rendered physically impossible because of the government orders. Indeed, the orders specifically identified restaurants as essential businesses and Ruth's Chris continued to operate other restaurants in Illinois. *See also Leonard v. Autocar Sales & Serv. Co.*, 64 N.E.2d 477, 480-81 (Ill. 1945) ("The appropriation of [the defendant's] temporary use by the United States for a period from March 11, 1943, to June 30, 1944, merely carved out of appellant's long-term lease a short-term occupancy, and destroyed neither the property nor appellant's lease-hold estate therein.")

Indeed, as another court has recognized in rejecting impossibility of performance in the lease context, "the primary promise of a lessee is to pay rent, and there is nothing legally impossible about that." *Warshawsky v. Am. Auto. Prods. Co.*, 138 N.E.2d 816, 821 (Ill. App. Ct. 1956) (internal citations omitted). The "'impossibility' doctrine never justifies failure to make a payment because financial distress differs from impossibility." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 728 (7th Cir. 2009) (citing Restatement (Second) of Contracts § 261 & cmt. d); *Unite Here Health v. ML Plaza Owner, LLC*, No. 19 C 5314, 2020 WL 12441956, at *2 (N.D. Ill. Dec. 9, 2020) ("[F]inancial hardship, no matter if occasioned by an economic crisis or a pandemic, is not objective impossibility."); *Deibler v. Bernard Bros.*, 53 N.E.2d 450, 453 (Ill. 1944) ("It is common knowledge that retail business generally, and of every kind, has been made more difficult and, no doubt, on the whole, less profitable, by innumerable restrictions and governmental regulations," but "it would certainly be an innovation to establish a rule that all lessees, affected in the same way, were relieved from the obligations of their leases."). Ruth's Chris does not assert that it could not have paid the rent—in other words, it was not objectively impossible for it to pay—it simply concluded that it would have been financially unsound for it to do so.[8]

Nor does Ruth's Chris's assertion that the pandemic was unforeseeable alter the Court's conclusion; the Illinois Supreme Court has held that a pandemic is foreseeable and should have been accounted for in a contract. *See Phelps v. Sch. Dist. No. 109*, 134 N.E. 312, 314 (Ill. 1922) ("It works no hardship on any one to require school authorities to insert in the contract of employment a provision exempting them from liability in the event of the school being closed on account of a contagious epidemic."). Ruth's Chris's contention that suspensions of service due to government regulations are unforeseeable is belied by the language of the *force majeure* provision, which expressly states that "[n]either Lessor nor Lessee shall be deemed in default of its respective obligations under this Lease . . . if it fails to timely perform . . . and such failure is due in whole or in part to any . . . restrictive governmental law or regulation . . . or any other cause beyond its reasonable control." (Lease, Dkt. # 1-1, at § 24.02.)

---

[8] At the onset of the COVID-19 pandemic, Ruth's Chris took actions to reduce operating costs and preserve its business, including: suspending all construction, non-essential capital expenditures, and quarterly dividends; furloughing team members at its home and field offices; stopping payment of rent and assessing the viability of operating each of its restaurants, including the Chicago restaurant; and reducing salaries for Ruth's Chris's executive team members and eliminating payments to non-employee directors.

In any event, the doctrine of impossibility requires that the "party demonstrate that it has tried *all* practical alternatives available to permit performance." *Downs v. Rosenthal Collins Grp., LLC*, 963 N.E.2d 282, 294 (Ill. App. Ct. 2011) (emphasis added). Ruth's Chris has made no such showing; it acknowledges that it made the decision to stop offering takeout and delivery service after only one week and ceased paying rent within a month.

The Court grants summary judgment to Hubbard on the defense of legal impossibility.

*Commercial Frustration*

"The doctrine of commercial frustration 'is an extension of the defense of impossibility.'" *SEC v. Equitybuild, Inc.*, No. 18 C 5587, 2021 WL 4159507, at *3 (N.D. Ill. Aug. 13, 2021) (citation omitted). "Commercial frustration excuses performance of a contract if the one asserting it 'show[s] that (1) the frustrating event was not reasonably foreseeable and (2) the value of counterperformance has been totally or nearly totally destroyed by the frustrating event.'" *Id*. "This doctrine is 'not to be applied liberally.'" *Id*.

As an initial matter and as already noted, Illinois courts have held that a pandemic is a reasonably foreseeable occurrence; thus, Ruth's Chris fails to satisfy this element. Even assuming the COVID-19 pandemic was unforeseeable, Ruth's Chris has not demonstrated that the value of the leased Premises was totally or nearly totally lost. *See id*. at *3 (rejecting commercial frustration defense because "while it may have been less profitable for Ventus to purchase the commercial real estate from the Receiver in April 2020, neither the pandemic, nor Ventus's temporary loss of financing, prohibited Ventus from purchasing the properties or running the buildings *at all*") (emphasis in original). Ruth's Chris contends throughout its briefs that it could not have reopened its restaurant, but its contention is always couched in terms of profitability. (Ruth's Chris's Opp'n Hubbard's Mot. Summ. J., Dkt. # 81, at 10) ("It is not of record, let alone undisputed, that Ruth's Chris could have reopened in any capacity and expected any profit over its marginal costs."). While it may have been less profitable to continue operating, Ruth's Chris has pointed to no evidence that it was wholly prohibited from operating the restaurant at all under the temporary government restrictions for the "short remaining term of the Lease." (*Id*., at 8.)[9]

---

[9] Ruth's Chris admits that A&G, the real estate consultant it hired on April 9, 2020, was initially directed to negotiate an early termination of the Lease. (Ruth's Chris's Resp. Hubbard's Stmt. Add'l Facts, Dkt. # 82, ¶ 14.) Moreover, on May 28, 2020, Ruth's Chris's general counsel advised consultants and staff that the Chicago restaurant "was [the] #1 priority to close," Ruth's Chris was "willing to spend a very large amount of money to close it," and that "[u]nder no circumstances should that restaurant reopen." Such circumstances do not support a finding of commercial frustration. *See Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d 224, 235 (S.D.N.Y. 2021) (concluding that because Gap store eventually commenced curbside pickup sales at the locations in question, the lease's purpose of operating retail stores in Midtown Manhattan was also not frustrated by pandemic itself, stating, "[w]hile undeniably unfortunate, the COVID-19 pandemic has not amounted to frustration of the Lease's purpose of Gap operating a retail business at the Premises. Instead, the evidence suggests that Gap has made a business decision to close its

For these reasons, the Court grants summary judgment in favor of Hubbard on Ruth's Chris' commercial-frustration affirmative defense.

*Unconscionability*

Hubbard moves for summary judgment on the unconscionability defense. As another court in this district recently summarized, under Illinois law, the "unconscionability analysis asks whether the agreement, by its formation or by its terms, is so unfair that the court cannot enforce it consistent with the interests of justice." *Patterson v. Respondus, Inc.*, No. 20 C 7692, 2022 WL 860946, at *13 (N.D. Ill. Mar. 23, 2022) (internal citations omitted). "A contractual provision may be unconscionable on either procedural or substantive grounds, or a combination of both." *Id*. "Whether a contractual clause is unconscionable is a question of law." *Id*.

Ruth's Chris contends that factual disputes remain related to the impact of the pandemic and whether Hubbard's interpretation of the Lease is substantively unconscionable. According to Ruth's Chris, Hubbard's interpretation of the Lease would require Ruth's Chris "to pay full rent while not being allowed to operate the Restaurant in a way that is the sole permitted purpose and use of the Premises," and thus constitutes an "imbalance render[ing] the agreement unconscionable." (Ruth's Chris's Opp'n Hubbard's Partial Mot. Summ. J., Dkt. # 81, at 10.) Substantive unconscionability "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Patterson*, 2022 WL 960946, at *13. The relevant factors to be considered include "contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Id*.

While it is true that under Hubbard's interpretation of the Lease, Ruth's Chris would bear the financial brunt of the temporary disruption caused by the COVID-19 pandemic, the parties are two sophisticated entities and are both capable of assessing the risks of certain contract clauses.[10] Indeed, as previously noted, the contract contains a *force majeure* clause, which provides that "[n]either Lessor nor Lessee shall be deemed in default of its respective obligations under this Lease . . . if it fails to timely perform same and such failure is due in whole or in part to . . . restrictive governmental law or regulation, . . . or any other cause beyond its reasonable control." (Lease, Dkt. # 1-1, § 24.02.) The Court notes its existence to demonstrate that an occurrence outside of the parties' control was a known possibility to both parties at the time the Lease was drafted. Other than the negative financial implications, Ruth's Chris points to no evidence that the contract was substantively unconscionable.

---

stores [at the relevant locations]. . . perhaps due to the pandemic's greater financial impact on those stores than on its other stores. . . .").

[10] According to its website, Ruth's Chris has over 150 locations worldwide; is a "world leader in upscale steak houses"; and, after a public stock offering in 2005, now trades on the NASDAQ. *See* https://www.ruthschris.com/our-story/ (last visited August 15, 2022.) Ruth's Chris, a public company with a global presence that routinely enters into contracts with franchisees and property owners, would be hard pressed to argue that it occupied an unfair bargaining position when negotiating the Lease terms.

11

The Court finds as a matter of law that the Lease is not substantively unconscionable and grants Hubbard's motion for summary judgment as to this defense.

*Taking*

In its fifth affirmative defense entitled "Taking," Ruth's Chris alleges as follows:

> Section 15.01 of the Lease states, in relevant part:
>
>> In the event the whole or any substantial part of the Building or the Premises is taken through condemnation or is to be conveyed to the condemning authority in settlement of or in lieu of condemnation, this Lease shall terminate as of the date title vests in such authority, and Rent shall be apportioned as of said date.
>
> The COVID-19 pandemic and related government-mandated closure of the Premises amounted to the Premises being taken and a transfer to the condemning authority in lieu of condemnation. Thus, Ruth's Chris does not owe Rent or any other obligation to Hubbard under the Lease after the commencement of the government-mandated closures.

(Answer, Dkt. # 11, at 10.)

Both parties construe Section 15.01 as implicating a "takings" claim under the Fifth Amendment of the Constitution; thus, prior to determining whether the Section 15.01 applies, the Court must first determine whether a taking occurred. The parties' discussions of the takings issue are so superficial as to provide little to no guidance to the Court. "The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Kreuziger v. Milwaukee Cty. & Mil. Metro. Sewerage Dist.*, No. 19-CV-1747-JPS, 2022 WL 3017431, at *3 (E.D. Wis. July 29, 2022). "The United States Supreme Court recognizes two forms of takings that are compensable under the Fifth Amendment: (1) 'a direct government appropriation or physical invasion of private property,' and (2) 'government regulation of private property [that is] . . . so onerous that its effect is tantamount to a direct appropriation or ouster.'" *Id*. The instant defense appears to be based on the latter—a regulatory taking.

Hubbard argues that Ruth's Chris has not demonstrated that the government orders were not valid exercises of regulatory authority or police power intended to protect the public health. Ruth's Chris asserts that Hubbard's citations are inapposite and conclusorily states that "the COVID-19 pandemic and [g]overnment [o]rders constitute a taking entitling Ruth's Chris to rent abatement and Hubbard has provided no facts or case law controverting this point." (Def.'s Resp., Dkt. # 81, at 12.) Hubbard contends there was no taking while Ruth's Chris asserts there was. But Ruth's Chris's bare assertion, unsupported by any citation to the record or relevant authority, that the government orders effected a taking, is insufficient to survive summary judgment. This is

especially true in light of the Seventh Circuit's recent statements that Governor Pritzker's COVID-19 orders "did not deprive property owners of all uses to which their premises might be put," so they "were free to make other uses of their properties consistent with the closure orders," and that "such uses would not have been their preferred or most profitable uses does not mean that the closure orders effected a regulatory taking." *Nowlin v. Pritzker*, 34 F.4th 629, 635 (7th Cir. 2022).

Accordingly, Hubbard's motion for summary judgment as to this defense is granted.

*Failure of Consideration*

"[A]n affirmative defense for 'failure of consideration' admits the existence of a contract but 'refers to transactions in which consideration was anticipated but did not materialize.'" *Cent. Nat'l Gottesman, Inc. v. J.S. Paluch Co.*, No. 19 C 06997, 2020 WL 8093513, at *1 (N.D. Ill. Oct. 22, 2020) (citation omitted). "It is the defendant's burden to name the consideration and establish plaintiff's failure to provide the promised consideration." *Id*. (citation omitted).

Hubbard contends that Ruth's Chris has not identified a failure of consideration given that Hubbard delivered the Premises pursuant to its obligation under the Lease, and Ruth's Chris "had quiet enjoyment of the same until it voluntarily abandoned the Premises . . . ." (Hubbard's Reply, Dkt. # 86, at 10.) Without citing to any authority, Ruth's Chris asserts that "Hubbard's contention misstates the law," but the Court does not see how. (Def.'s Resp., Dkt. # 81, at 12.) Nor is Ruth's Chris's contention that "the special nature of the COVID-19 pandemic may support a failure of consideration defense depending on its impact on the relevant business," *id*. (citing *Banco Santander (Brasil), S.A. v. Am. Airlines, Inc*., No. 20-CV-3098 (RPK) (RER), 2021 WL 4820646, at *6 (E.D.N.Y. Oct. 15, 2021); *Regal Cinemas v. Town of Culpeper*, No. 3:21-cv-4, 2021 WL 2953679, at *10 (W.D. Va. July 14, 2021)), persuasive because the cases it cites for this proposition are inapposite. First, both are rulings on motions to dismiss. Moreover, even assuming that COVID-19 is of a "special nature," Ruth's Chris fails to explain how the particular circumstances of this case constitute a failure of consideration.

Hubbard's motion for summary judgment on the defense of failure of consideration is granted.

*Reformation and Surrender*

While Hubbard moves for summary judgment on a surrender defense, Ruth's Chris asserts that it had not pleaded one. Accordingly, Hubbard's motion for summary judgment as to the surrender defense is denied as unnecessary. As for reformation, Ruth's Chris's defense states as follows:

> The express purpose of the Lease between RCSH and Hubbard was to allow RCSH to use the Premises for the purposes of operating a restaurant. (Lease §§ 1.01(C) (defining "Premises"), 1.01(I) (stating the Premises will be used "ONLY and for NO other use or purpose" than the operation of Ruth's Chris Steak House).) The COVID-19

13

> pandemic and related government-mandated closure of the Premises, which was entirely unforeseeable and beyond RCSH's control, deprived RCSH of the intended use of the Premises by rendering the intended use impossible, illegal, and/or impracticable. Consequently, the COVID-19 pandemic and related government-mandated closure of the Premises, rendered the purpose of the Lease frustrated, impossible, illegal, and/or commercially impracticable. Thus, the consideration RCSH received in exchange for entering the Lease failed. RCSH is thus entitled to judicial reformation and termination of the Lease.

(Answer, Dkt. # 11, at 10.) Hubbard asserts that because the parties did not have an agreement to excuse Ruth's Chris's performance in the event of a pandemic, reformation is improper. *See Briarcliffe Lakeside Townhouse Owners Ass'n v. City of Wheaton*, 524 N.E.2d 230, 235 (Ill. App. Ct. Dist. 1988) ("The underlying basis for a reformation action is the existence of a mutual understanding between the parties which the parties agreed to reduce to writing, but in doing so, either through mutual mistake or mistake on one side coupled with fraud on the other, omitted some material provision."). Ruth's Chris has failed to respond to Hubbard's argument, so the defense is waived. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("[F]ailure to respond to an argument . . . results in waiver."). Summary judgment is granted in Hubbard's favor as to the reformation defense.

**Conclusion**

For the reasons stated above, Hubbard's motion for partial summary judgment and cross-motion for summary judgment on tenantability issues are granted. Ruth's Chris's motion for summary judgment is denied. The parties are directed to confer and file a status report within 10 days of the date of entry of this order setting forth the issues remaining for trial and listing three proposed trial dates in January and February 2024. The parties' report shall also include an estimated length of trial.

**Date:** October 3, 2022

**Ronald A. Guzmán**
**United States District Judge**